

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 1, 2008

**BY HAND AND ECF**

The Honorable William H. Pauley III
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

      Re:  **United States v. Borbon and Santana**,
           07 Cr. 986 (WHP)

Dear Judge Pauley:

      The Government respectfully submits this post-hearing letter-brief following the two-day evidentiary hearing held before Your Honor in connection with defendant Raul Borbon's suppression motion.  As the testimony at the hearing demonstrated, when law enforcement arrested the defendant in his home on May 18, 2007, they conducted a proper protective sweep of his residence.  During that security sweep, law enforcement observed -- in plain view -- numerous items whose incriminating character was immediately apparent: a strong odor of marijuana coming from the defendant's apartment, approximately eight 50-pound bags of Miracle Grow, numerous books, magazines, and videos related to the growing of marijuana, 166 marijuana plants, and an extensive fan, lighting, and timer system.  Under the "plain view" exception to the Fourth Amendment, this evidence should not be suppressed.  For the reasons to follow, the defendant's motion to suppress should be denied.

Hon. William H. Pauley III
August 1, 2008
Page 2

## SUMMARY OF THE EVIDENCE

### A. Police Officer Kurt Maier

Police Officer Kurt Maier, assigned to the 46th Precinct Special Projects Unit, testified that he's applied for and executed approximately 300 search warrants in his career with the New York City Police Department ("NYPD"). (See Suppression Hearing Transcript, dated June 4, 2008 and June 13, 2008 ("Tr.") at 5-6). On the evening of May 18, 2007, Officer Maier was assigned "hot spot" overtime and was patrolling (along with Officers Crosas and Pedraza) the area around 2244 Creston Avenue in the Bronx ("2244 Creston"), which area has a high incident of crime including drug trafficking, robberies, assaults, and burglaries. (Tr. 7-8).

At approximately 10:30 p.m., the Officers stopped defendant Johans Santana[1] in front of 2244 Creston, pursuant to the "Clean Halls Program," which permits the NYPD to arrest non-residents and non-approved guests of Clean Halls buildings, like 2244 Creston, for criminal trespass. (Tr. 8-9). Santana stated that he has just visited a friend in apartment 6B ("6B" or the "Apartment"), and the Officers took steps to verify that. (Tr. 9). Officer Maier and another officer went to 6B, while Santana stayed downstairs with Officer Pedraza. (Tr. 9-10).

Upon arriving on the 6th floor, Officers Maier and Crosas ran into a 6th floor neighbor, who informed them that drugs were produced or "cooked" in the Apartment. (Tr. 10-11). Officer Maier also smelled an odor of marijuana while standing in the hallway outside the Apartment. (Tr. 11). Officer Maier then knocked on 6B, stated that they were police officers, and asked to verify who had just visited 6B. (Tr. 12-13). Borbon asked for a few minutes to get dressed, and then opened the door about halfway. (Tr. 12-14). The lights were on inside the Apartment, and Officer could see inside. (Tr. 12-14).

With the door to 6B open, Officer Maier noted an odor of marijuana inside. (Tr. 13). Further, Officer Maier could see: [1] seven or eight large bags of Miracle-Gro stacked up against the wall, [2] a few plastic bags containing dead marijuana stalks, [3] a metal entertainment cabinet, containing a

---

[1] Defendant Jonas Santana has not joined Borbon's instant motion to suppress.

Hon. William H. Pauley III
August 1, 2008
Page 3

television, and books, videos, magazines, and paraphernalia related to growing marijuana,[4] a cot, [5] large plastic sheeting running from floor to ceiling and from wall to wall, and [6] an aluminum duct running the length of floor. (Tr. 13-15). The spines of some of these books and videos were positioned "face out" and were visible and readable. (Tr. 67). Moreover, Officer Maier heard "rustling" coming from within the Apartment. (Tr. 15). Though he could not pinpoint where the sound was coming from, Officer Maier thought that "it might have been another individual who was either hiding something, destroying something of an evidentiary nature, or preparing to do something harmful towards myself and my partner." (Tr. 15-16).

To ensure the safety of himself and his partner, and to confirm that no evidence was destroyed, Officer Maier conducted a "safety sweep." (Tr. 16). The safety sweep took less than a minute, during which time Officer Maier observed, in plain view, 144 marijuana plants and a fully automated growing, lighting, watering, and ventilation system (in the bedroom); and a second lighting, growing, and a water/ventilation system, plus numerous small growing pots with soil in them (in the living room). (Tr. 17-18). Finally, Officer Maier saw a plastic bag wrapped around what looked like a pistol inside of the open hall closet. (Tr. 17-18).

Immediately following the safety sweep, Officer Maier asked whether there was anything in the Apartment that could hurt the Officers; Borbon wasn't sure, and disavowed owning anything in the closet. (Tr. 17-18). Officer Maier took this statement to be mean that there was a firearm in the closet for which the defendant did not want to take responsibility. (Tr. 19). Next, Officer Maier called his lieutenant and handcuffed the defendant for safety reasons according to NYPD policy. (Tr. 19)

After Officer Maier's lieutenant arrived, Officer Maier and his partner removed the defendant from the Apartment and secured the area by positioning an NYPD officer outside the Apartment. (Tr. 19). Officer Maier then traveled to Bronx District Attorney's Office to draw-up a search warrant for the Apartment. (Tr. 19).

B.   Johans Santana

The defendant Johans Santana testified that the Apartment was originally leased by himself and his sister, but then sublet to Borbon in May 2006 (Tr. 102, 113). Prior to

Hon. William H. Pauley III
August 1, 2008
Page 4

subleasing the Apartment, Santana removed all his belongings from the Apartment, and had not returned to the Apartment until May 2007. (Tr. 113-14, 124-25). Santana denied owning both the firearm and bulletproof protector recovered from the hall closet. (Tr. 124-25).

On the night of May 18, 2007, Santana went to 2244 Creston to borrow $100 from Borbon. (Tr. 103). They met in the hallway outside 6B and chatted for about five minutes; Santana then left. (Tr. 114-15). Santana did not recall seeing whether the door to the Apartment was open or closed. (Tr. 114-15). Outside 2244 Creston, Santana was approached by NYPD officers, who asked him whom he had visited; Santana said "6B." (Tr. 106). Santana saw one officer go into 2244 Creston, while another stayed behind with him in a friend's car. (Tr. 106-07, 109). Santana conceded that he could not see what occurred outside or inside of the building. (Tr. 125-26). He confirmed that 2244 Creston has two sets of stairwells and that he couldn't see both from the car where he was sitting. (Tr. 126).

Sometime later, Santana received a call from Borbon. (Tr. 108). Twenty to twenty-five minutes later, Santana saw NYPD officers, including lieutenants, enter 2244 Creston. (Tr. 111-12). Santana was arrested for criminal trespass. (Tr. 112).

Following his arrest, Santana returned to the Apartment to help Borbon clean it out. Among other things, Santana observed: wood 2x4s, clothing, flourescent light bulbs, bags of soil, some mattresses, and a metal entertainment system. (Tr. 111-122). The entertainment system was located in the hallway/foyer area of the Apartment. (Tr. 122; GX-10; DX-P). The hallway/foyer measured six or seven feet long. (Tr. 122). Santana noticed no damage to the front door, door frame, or threshold to the Apartment; he saw no insulation or padding that would have prevent air from entering or leaving 6B. (Tr. 127). Santana didn't recall any chain on the front door to the Apartment. (Tr. 124).

C.  Raul Borbon

Defendant Raul Borbon testified that he sublet the Apartment from Santana in May 2006 and lived there in May 2007. (Tr. 133). He admitted that the entire marijuana set-up belonged to him. (Tr. 153-55). On May 18, 2007, after Santana left,

Hon. William H. Pauley III
August 1, 2008
Page 5

Borbon said he heard a knock on the door, looked through the peephole, saw two NYPD officers, and opened the door a bit. (Tr. 134-35, 176). Borbon told the police that Santana had just left, and then called Santana. (Tr. 137).

Borbon then returned to watching TV -- "Smallville, the Adventures of Lois and Clark" -- from his cot in the hallway/foyer of the Apartment. The TV program was on loud enough so that someone "could hear the TV . . . from the outside." (Tr. 172). A short time later, NYPD officers allegedly returned and "started punching and kicking" the door to 6B. (Tr. 137). Borbon asked the police to wait so he get dressed and put on his slippers. (Tr. 139, 178). Borbon then turned off the TV and opened the front door. (Tr. 138-39). While trying to step outside, Officer Maier allegedly "pushed up against" him, so Borbon "pushed back at him." (Tr. 137). Then, both officers forced him into the apartment and handcuffed him. (Tr. 137).

Borbon's described the Apartment configuration. In the hallway/foyer were [1] seven 50-pound bags of Miracle-Gro fertilizer stacked bag-upon-bag, [2] books, magazines, and DVDs all related to the production of marijuana and visible, and [3] a metal entertainment center. (Tr. 158-64). Beyond the hallway/foyer was a black plastic wall that went floor to ceiling. There was also an extensive ventilation system: [1] two six-inch fans were by the front door, [2] a "Vornado" model fan at the end of the foyer, [3] a 16-inch oscillating fan and a 12-inch vent fan in the living room, and [4] a box fan, another 16-inch oscillating fan, and a 10-inch fan in the bedroom. (Tr. 164-67). The ventilation system ran 24-hours a day, and was on when the police arrived. (Tr. 169). Additionally, Borbon had rigged a lighting system that included six lights and six fans, which were always on. (Tr. 183).

Borbon confirmed that the hallway light, outside the Apartment, was always on. (Tr. 183).

Hon. William H. Pauley III
August 1, 2008
Page 6

### ARGUMENT

The evidence seized from Raul Borbon's Apartment on May 18, 2007 apartment -- namely, approximately eight 50-pound bags of Miracle Grow, numerous books, magazines, and videos related to the growing of marijuana, 166 marijuana plans, and an extensive fan, lighting, and timer system -- was evidence that was in plain view during the proper and lawful security sweep of the Apartment. The defendant does not dispute that the Miracle-Gro, entertainment system complete with marijuana how-to books and videos, and several fans were immediately apparent in the foyer. Nor does he dispute that there was an extensive system of fans running within the Apartment. Nor does he dispute that the TV was on. Rather, the defendant argues that no items (or odors) were in plain view.[2] For the reasons to follow, the defendant's arguments should be rejected.

**A. The Items In Plain View and Observed During the Security Sweep Should Not Be Suppressed**

  **1. Legal Framework**

Under the "plain view" exception to the Fourth Amendment, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); see also Horton v. California, 496 U.S. 128, 135 ((1990) ("an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant"); United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999) ("Patently incriminating evidence that is in plain view during a proper security check may be seized without a warrant.").

Further, law enforcement may conduct a warrantless search or seizure if exigent circumstances justify the intrusion. Exigent circumstances exist when there is probable cause for a search or seizure and the evidence sought is in imminent danger

---

[2] The defendant makes other arguments in his motion to suppress, but given the limited scope of the evidentiary hearing the Government limits its response to the Officers entry into the defendant's apartment.

Hon. William H. Pauley III
August 1, 2008
Page 7

of destruction, the safety of law enforcement officers is threatened, or a suspect is likely to flee before the pursuing officer can obtain a warrant. See, e.g., Cupp v. Murphy, 412 U.S. 291, 294-95 (1973) (exigent circumstances justified warrantless search because police had probable cause to arrest and feared destruction of evidence); Warden v. Hayden, 387 U.S. 294, 298-99 (1967) (exigent circumstances justified warrantless entry of house to search house because delay would endanger lives of officers and public); Minn v. Olson, 495 U.S. 91, 100 (1990) (warrantless intrusion may be justified by need to prevent suspect's escape).

2.  **Discussion**

As noted, the defendant does not dispute that the Miracle-Gro, entertainment system complete with marijuana how-to books and videos, and several fans were immediately apparent in the foyer. Nor does he dispute that there was an extensive system of fans running within the Apartment. Nor does he dispute that the TV was on. But the defendant contends that it was "impossible" to smell marijuana coming in from the Apartment and that Officer Maier could not "see" the Miracle-Gro bags. (Memorandum of Law in Support of Raul Borbon's Pretrial Motions ("Def. Mem.")[3], at 6-9; Reply Memorandum of Law in Support of Raul Borbon's Pretrial Motions ("Def. Reply"), at 2-6)).

Upon his arrival on the 6th Floor of 2244 Creston, Officer Maier was notified by a neighbor that there were narcotics-related activities within the Apartment. At that time, Officer Maier also smelled marijuana. When Borbon opened the door to the Apartment, after getting dressed and donning his slippers, Officer Maier recalled an immediate smell of marijuana emanating from the Apartment. What he saw only confirmed Officer Maier's concern that criminal activity was afoot and that his security might be an issue. Indeed, Offiver Maier saw multiple 50-pound bags of Miracle-Gro stacked up against the wall, plastic bags containing dead marijuana stalks, a metal entertainment center containing books and videos about growing marijuana, a cot, large plastic sheeting running from floor to ceiling and from wall to wall, and an aluminum duct running the length of floor.

---

[3] The defendant failed to use page numbers on his papers; hence the Government has cited to the applicable page.

Hon. William H. Pauley III
August 1, 2008
Page 8

And Officer Maier was reasonable in his belief that what he heard within the Apartment -- i.e., Borbon's elaborate ventilation system -- could have been another individual or someone possibly destroying evidence. Borbon's testimony makes this plain:

> As you're walking from the foyer, first there is a the small twin six-inch fans that was by the front door. Then right at the end of the foyer there was a Vornado fan that was blowing air into the living room. Inside the living room was a rotating fan, one of those 12-inch fans that rotate, 16-inch fans that rotate. Then in the corner of the living room on the right side there was a vent fan, a 12-inch vent fan that would suck the air out of the living room and dump -- it would flow through the ducking in the apartment and dump it right in front of the bedroom. In front of the bedroom there was another fan, one of those box fans right in front of there that would blow the air into the bedroom. Inside the bedroom there was another 16-inch rotating fan circulating the air. Then I had the -- I think it was a 10-inch vent fan that would suck out the air from that point at the corner of the bedroom.

(Tr. 166). There were also six additional fans connected to the lighting system. (Tr. 183). Lastly, Officer Maier testified that he believed the sound inside the Apartment was another individual who may be spoliating evidence or attempting to escape. See Cupp, 412 U.S. at 294-95.

Prior to crossing the threshold to the Apartment, the combination of what the defendant smelled (marijuana), saw (fertilizer, media relating to marijuana, dead marijuana plants, plastic sheeting, and an aluminum duct), heard (the TV and the "rustling" from within the Apartment, and had recently learned (drugs were being manufactured within the Apartment) clearly permitted Officer Maier to enter the Apartment to conduct a security sweep; and what was observed within falls the plain view exception. Dickerson, 508 U.S. at 375); Horton, 496 U.S. at 135; United States v. Humphries, 372 F.3d 653, 659-60 (4th Cir. 2004) (seizure valid because officer smelled strong odor of marihuana when approaching and following defendant, providing probable cause to seize and search); United States v. Tobin, 923 F.2d 1506, 1511-12 (11th Cir. 1991) (entry and search valid because

Hon. William H. Pauley III
August 1, 2008
Page 9

officer could smell marijuana coming from inside after legally approaching residence to dispel suspicion of drug trafficking).

      Likewise, the evidence Officer Maier saw during his security sweep -- i.e., the fans themselves, the marijuana plants, the lighting system, the ducts, plastic sheeting, and the like -- falls within the plain view exception. Kiyuyung, 171 F.3d at 78. Any combination of these factors justified Officer Maier's entry into the Apartment.

      The defendant argues that no items (or odors) were in Officer's Maier plain view. These arguments are meritless. The defendant's repeated claims that his home-built and untested ventilation system made it "impossible" for the marijuana smell to be perceived is ridiculous. (Def. Mem. at 8-9; Def. Reply at 5-6). The defendant's claims that the still-sealed bags of Miracle grow were wrapped in black plastic and that the front door could only open a few inches is supported by no evidence other than the defendant's uncorroborated testimony. The defendant's contentions that there was insufficient lighting to allow a trained officer to see what was just a few feet away is belied by both Officer Maier's testimony and the fact that the defendant conceded that the hallway light was "on." And the defendant's assertions that the officers, essentially, forced their way into the Apartment is contradicted by Santana's testimony that (a few days after the incident) the door and door frame were undamaged. At base, the defendant's testimony and claims are incredible; and his arguments are equally unsupported by logic or fact.

      * * *

      In sum, Officer Maier's entry into the Apartment to conduct a security sweep was clearly justified and permitted him to seize patently incriminating evidence that was in plain view.

Hon. William H. Pauley III
August 1, 2008
Page 10

B.  The Search Warrant Was Valid

      As set forth above, if the Court determines that these items were in plain view, and were incriminating on their face, the Court need not determine whether the search warrant sets forth probable cause for their seizure.

      In any event, the search warrant sets forth sufficient facts to support seizure of the items set forth in the warrant. And "[a] magistrate judge's probable cause determination is entitled to 'substantial deference' when reviewed by a district court, and any doubts are to be resolved in favor of upholding the determination." United States v. Morales, 280 F. Supp. 2d 262, 268 (S.D.N.Y. 2003) (citing United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983)).

## CONCLUSION

      For the foregoing reasons, the defendant's suppression motion should be denied.

                            Respectfully submitted,

                            MICHAEL J. GARCIA
                            United States Attorney

By: _____
                            Benjamin Naftalis
                            Assistant United States Attorney
                            (212) 637-2456

cc:  Defense Counsel